**UNITED STATES of America ex rel. Frank BROWN, Petitioner-Appellee,**

v.

**Robert G. SMITH, Warden, Vermont State Prison, Respondent-Appellant.**

**No. 351, Docket 27418.**

United States Court of Appeals
Second Circuit.

Argued May 3, 1962.

Decided July 17, 1962.

Petition for Rehearing in Banc
Denied Oct. 1, 1962.

98, 3 L.Ed.2d 99 ; Tripp v. United States, 10 Cir., 295 F.2d 418, 425, 426.

4. See Sapir v. United States, 348 U.S. 373, 75 S.Ct, 422, 99 L.Ed. 426.

Thomas M. Debevoise, Woodstock, Vt. (Charles J. Adams, Atty. Gen., State of Vermont, Montpelier, Vt., on the brief), for respondent-appellant.

John S. Burgess, Brattleboro, Vt. (Henry F. Black, White River Junction, Vt., and Robert H. Gibson, Brattleboro, Vt., on the brief), for petitioner-appellee.

Before LUMBARD, Chief Judge, and WATERMAN and FRIENDLY, Circuit Judges.

LUMBARD, Chief Judge.

The State of Vermont and the warden of its prison appeal from an order of the district court granting the discharge of Frank Brown on a writ of habeas corpus for the State's "failure to accord petitioner a fair trial by a panel of indifferent jurors plus the denial of state appellate review" in violation of his constitutional rights after his sentence in the Windham County Court to life imprisonment for arson causing death. The order stayed the release for thirty days to enable the State to take steps for a new trial. When the State determined to appeal, the judge granted it a certificate of probable cause and directed that Brown be placed in the custody of the United States Marshal and that he be released in $5,000 bail.

The record does not support the district judge's finding of jury prejudice. The Vermont courts afforded Brown all the rights of review to which he was constitutionally entitled in view of his failure to file a timely appeal in accordance with the Vermont statute, and thus we find no constitutional error in the denial of full appeal under the circumstances. Accordingly, we reverse the order of the district court and direct that bail be revoked and that Brown be returned to the warden.

On December 26, 1958, shortly after 9 P.M., a fire started in a ground floor drugstore at 14 Elliot Street in Brattleboro, which store was managed and con-

trolled by Brown. Smoke spread rapidly to the rest of the building. One Lyman Streeter, who resided in a third floor apartment above the store, was carried from the building and died within a few minutes. According to the State's evidence at the trial death was caused by asphyxiation from inhaling smoke. There was also evidence that Brown left the building an instant before smoke and fire were seen coming from the store. Seven months after the fire, on July 23, 1959, Brown was indicted for arson resulting in Lyman Streeter's death, a capital offense under the Vermont statutes. 13 Vt.Stat.Ann. § 501.

On July 27 Brown appeared in the County Court for arraignment, accompanied by Mr. Burgess, who has been one of his counsel ever since. After the court had set the trial for September 15, Brown's counsel moved that he be admitted to bail, a matter which is discretionary in capital cases under Vermont law. Dr. David Ruml, a Brattleboro physician, testified that in January Brown had had a coronary condition, that two months before the hearing he had had a heart attack and that his detention in jail would create additional tension. The Deputy Attorney General,[1] Mr. Debevoise, on cross-examination asked the doctor whether it would make any difference in his opinion if he knew that Brown had been "previously arrested and incarcerated on the following convictions." Objection was made to this question by Mr. Burgess and counsel argued the propriety of the question. At this point the judge raised the question of prejudice, resulting in the following colloquy:

"Court: What do you say about the element of prejudice?

"Mr. Debevoise: I think the Court can order the Courtroom cleared but I believe this is pertinent to the inquiry under discussion which is whether or not bail should be granted in the Court's discretion and the respondent in his applicated [sic] is

started off with an opinion by the doctor based on medical reasons. The State should have an opportunity to see if the doctor has all the facts regarding the background.

"Court: Why don't you simply ask whether without skirting the element of prejudice?

"Mr. Debevoise: You mean without mentioning specific crimes?

"Court: Yes.

"Q. Would it make any difference to your opinion, Doctor, if it were the fact that on thirty-six different occasions this respondent has been charged with at least one crime?

"Mr. Burgess: We again object. We don't see the relativity of what somebody has been charged with on the doctor's medical opinion.

"Court: We will take the answer. You may have an exception.

"A. No, I don't think it would.

"Q. It is six weeks between now and trial, about six weeks. Would it make any difference to your opinion if the respondent on at least eight different occasions spent periods of time longer than six weeks in jail?

"A. No. I believe this man being in jail, this is an anxiety producing state, I think it is a greater anxiety producing state than being out on bail. This man has a serious heart condition and I think anything which jeopardizes his life should be avoided if possible."

Mr. Burgess made no application to clear the courtroom and made no objection whatever to the proceedings which followed the Deputy Attorney General's suggestion that the courtroom could be cleared. During further colloquy it appeared that the criminal record referred to covered the years 1928 to 1944 when Brown was in Boston. Brown's criminal record was also offered as relevant to the likelihood of flight. The details of the record

---

1. The State's Attorney, Ernest W. Gibson III, had disqualified himself as he was

clerk of the corporation of which Brown was principal stockholder and manager.

were not made public and were not published or broadcast. At the conclusion of the hearing the judge ordered Brown committed to the custody of the Sheriff without bail.

The next day, July 28, the Brattleboro Daily Reformer published a front-page lead article under a one column headline reading "Brown Held For Arson Trial in Sept.," with the sub-heading "Bail Denied by Court; Record of 36 Arrests Cited." The account was factual and restrained and accurately related what had occurred at the public proceedings in the County Court at Newfane the day before. After three preliminary paragraphs the account continued:

"On the matter of bail the respondent's request to be heard was granted on the grounds that even in a capital crime it is left to the discretion of the judge. Dr. David Ruml of Brattleboro testified that he had treated Brown for an acute coronary condition in December or January and for an acute heart attack about two months ago. He said that the emotional tension which might bring on another attack would be lessened if Brown were allowed to be free on bail.

"Deputy Atty. Gen. Debevoise asked Dr. Ruml is [sic] he would change his opinion if he knew that the respondent had been charged on 36 different occasions with at least one crime and had been sentenced at least eight times to serve longer than six weeks in jail in Massachusetts, according to his Boston criminal record between 1928 and 1944.

"Debevoise stated that the only issue was the likelihood of flight, and considering Brown's background his release on bail was not feasible.

"Judge Leonard W. Morrison denied bail in view of the fact that Brown is charged with a crime punishable by death."

On September 4, 1959 Brown moved, pursuant to 13 Vt.Stat.Ann. § 4631, for his removal to and trial in another county on the ground that there existed in Windham County such prejudice against him that a fair and impartial trial could not be had. Major reliance was placed upon the disclosure of Brown's criminal record in the July 28 article, but certain other newspaper, radio and television reports were also referred to and set forth as exhibits. The moving papers pointed out what was regarded as prejudicial in these other reports, as follows:

"[S]ome of the news stories as published in the Brattleboro Daily Reformer set forth, among other things, that 'Brown drove up to the police station in a blue Cadillac convertible.'

"It has also been stated in news stories that the arrest of the respondent 'followed a long investigation by the State Fire Marshal's office,' and further that State Pathologist Richard S. Woodruff of Burlington 'reported his findings that Streeter's death was caused by smoke inhalation.' "

The most recent news report referred to was that relating to the bail hearing in the Reformer on July 28, and no other reports have been referred to at any stage in these proceedings. It is apparently undisputed that the news media carrying these stories have a very substantial audience in Windham County.

On October 1 the court heard the motion and took testimony thereon. The only witness called to establish the existence of prejudice was A. Luke Crispe, counsel for the previous owners of the drugstore who had taken the store back on foreclosure and who admittedly would be in a better position to collect on the insurance if Brown was acquitted. While Mr. Crispe gave his opinion that the publicity had definitely created prejudice against Brown, he also stated categorically that he was not saying that Brown could not get a fair trial in the county. On October 8 Judge Sylvester denied Brown's motion, stating that he found nothing inflammatory or denunciatory in the newspaper articles. Regarding the radio spot newscasts he said that

these appeared to be "nothing more than a dissemination of a normal news topic of more than average interest to the inhabitants of Windham County to be sure but still a news account and so utilized by the radio station."

On the afternoon of October 26, after the denial of several preliminary motions, including another motion for a change of venue, the court commenced the selection of the jury, which continued on the following day and concluded on the morning of October 28 after twelve jurors and two alternates had been chosen. Of the forty-seven prospective jurors examined, twenty-one were excused for cause on the motion of the State and three by the court of its own motion. The defendant exercised his full six peremptory challenges, and in addition challenged three persons for cause, all of whom were excused. Although Brown's counsel now attack the conduct of the *voir dire* (in respects to be discussed later), at the conclusion of the examination they stated that they were "content" with the jurors chosen. No motion for a continuance was made at any stage of the proceedings.

The trial proceeded and ended on November 5 with a verdict of guilty; on November 24 Brown was sentenced to life imprisonment according to the jury's recommendation. His subsequent motions for a new trial and for judgment notwithstanding the verdict were denied.

Although Brown indicated his intention to appeal immediately after sentencing, and permission to do so *in forma pauperis* was granted by the Vermont Supreme Court on December 15, Brown's counsel failed to satisfy the requirements of the Vermont statute for timely proper filing of his notice of appeal. Under 12 Vt. Stat.Ann. § 2383, filing was required within thirty days of Brown's official notification of the judgment, in this case, on or before January 4, 1960. 12 Vt.Stat. Ann. § 2382 then required "the filing of a notice of appeal as hereinafter set forth with (1) the clerk of the court appealed to and (2) the clerk or register of the tribunal appealed from * * *." Brown's counsel made a timely filing with the clerk of the general term of the Supreme Court, but did no more until after the January 4 deadline had passed. The Supreme Court held, by a 3 to 2 vote, that it was compelled to dismiss the appeal for lack of jurisdiction, noting that Brown's counsel had not only improperly filed his notice with the clerk of the general term instead of the Windham County clerk, who was clerk of the Supreme Court for Windham County, but also had totally failed to give notice to the clerk of the court appealed *from*, as was clearly required by the statute. The court declined to rest its decision on the first of these defects, but held the second fatal. State v. Brown, 121 Vt. 459, 160 A.2d 879 (May 3, 1960). The court went on to state that it was its view that in thus being denied the right to appeal, Brown "has not been deprived of due process." Id, at 466, 160 A.2d at 883.

Brown still had available to him under Vermont procedure the remedy of a petition to the Supreme Court for a new trial, and indeed he had already filed such a petition on May 1, 1960. The petition raised again the question of jury prejudice, asserted the existence of newly discovered evidence, and stated that "in the event this Honorable Court dismisses the appeal previously filed with it, the petitioner will be deprived of judicial review of this trial on a capital offense through mistake of law on the part of counsel. * * *" The court dismissed the petition on September 6, 1960. 122 Vt. 59, 163 A.2d 845. In so doing, it took account of the fact that after the conviction a jury in civil actions brought in federal court against four fire insurance companies by The Harry Soffer Drug Co., of which Brown no longer had control, had determined that the fire was not incendiary in origin.[2] Al-

2. Suit for $70,000 for fire loss was brought against Centennial Insurance Co. of New York, Standard Fire Insurance Co. of Connecticut and Seaboard Fire & Marine Insurance Co. of New York. The jury awarded $38,000. Suit for $15,000 lost

though it did not pass specifically upon any claims of substantive error at Brown's trial, the Supreme Court did conclude that "We fail to find that any injustice was suffered by this petitioner upon trial, nor does it appear to us that the result would be changed if another trial was to be had." 122 Vt. at 66, 163 A.2d at 850. It noted that not all the witnesses were the same in the civil as in the criminal trial, and that the contexts in which the issue of the origin of the fire was raised differed. The Supreme Court reconsidered the entire issue of jury prejudice, and rejected the claim that Brown "received an unfair and partial trial. * * *" It also again rejected the claim of an unfair denial of the right to appeal. After this decision, Brown sought certiorari in the United States Supreme Court, which was denied on February 20, 1961. 365 U.S. 822, 81 S.Ct. 706, 5 L.Ed.2d 699.

On July 18, 1961, Brown petitioned the United States District Court for the District of Vermont for a writ of habeas corpus. Judge Gibson then disqualified himself [3] and Judge Timbers was designated to sit and hearings commenced on July 27. Judge Timbers took no testimony during the hearings. On December 22, 1961 he filed a lengthy opinion granting the writ, D.C., 200 F.Supp. 885–943, and on January 12, 1962, he granted the State a certificate of probable cause for appeal and admitted Brown to Bail.

■ *Exhaustion of State Remedies*— We agree with Judge Timbers that Brown sufficiently exhausted his Vermont remedies to give the federal district court jurisdiction to entertain his petition as to both the federal claims asserted —that he was unconstitutionally deprived of a fair trial by indifferent jurors and denied state appellate review. These claims were both considered by the Vermont Supreme Court on the petition for

a new trial, and certiorari to that court was unsuccessfully sought in the United States Supreme Court. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); see Irvin v. Dowd, 359 U.S. 394, 79 S.Ct. 825, 3 L.Ed.2d 900 (1959). Thus we pass to the merits of the two constitutional claims which Judge Timbers held well-founded.

1. *Denial of a fair trial by a panel of indifferent jurors*—Judge Timbers' conclusion that Brown had been denied his right to trial by an impartial jury was compounded of several elements. First he condemned the Deputy Attorney General's disclosure of Brown's criminal record at the public bail hearing, stating that it had a "devastating effect—alone and in combination with other factors— upon petitioner's chances for a fair trial by a panel of indifferent jurors * * *" While Brown's criminal record was relevant on the matter of bail, and the actual incarcerations may have had some slight relevance to Dr. Ruml's testimony, we think a prosecutor should take every precaution to see to it that such information does not become public through any act of his unless the objections or actions of the defendant or his counsel make it impossible to have such information brought to the judge's or the witness's attention in any way short of public disclosure. Cf. Delaney v. United States, 199 F.2d 107, 113–14 (1 Cir. 1952). But any charge of prosecution impropriety in making this prejudicial information available to the press is very much weakened by the fact, disclosed by the portion of the transcript we have quoted above, that the Deputy Attorney General suggested that the courtroom might be cleared before the details of Brown's record were brought out. Since Brown's counsel failed to take up this suggestion, responsibility for what later happened, when the Deputy Attorney General gave

business was brought against Twin City Fire Insurance Co. of Minnesota and the jury awarded $3,275. The suits were tried together before Judge Foley.

3. Judge Gibson disqualified himself as his eldest son was counsel for the plaintiff

in the civil action against the insurance companies, and his second son was an attorney practicing with John S. Burgess who filed the petition.

further particulars and went beyond arrest and incarceration to include mere charges of crime, is shared by defense counsel.

Judge Timbers found that the publicity given to the disclosure of Brown's criminal record, taken together with the other publicity set forth in that portion of Brown's petition for a change of venue which we have quoted above in our statement of the facts, constituted "saturation coverage of the community with stories about the fire, petitioner's complicity in the alleged crime and the State's investigation of the crime." He concluded, relying primarily upon the Supreme Court's decision on the merits in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), that the resulting prejudice against Brown, as reflected in the *voir dire* examination of jurors, was so great that it was impossible for Brown to receive a fair trial by impartial jurors in Windham County. He found the prejudice to be compounded by certain aspects of the conduct of the *voir dire* examination.

 We agree with Judge Timbers that the principle clearly stated by the Supreme Court in Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. 1639, required a *de novo* examination by him of the *voir dire* testimony to determine whether the jurors who convicted Brown lacked that impartiality which the Fourteenth Amendment requires. The district judge took no testimony and as there were no issues of credibility we are in as good a position as he to determine what inferences should be drawn from the admitted facts. Cf. Orvis v. Higgins, 180 F.2d 537 (2 Cir.), cert. denied, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950). But on our own examination of the *voir dire* transcript as well as the testimony and exhibits pertaining to the motions for a change of venue, we find so little support for his conclusions that we must reject as clearly erroneous his conclusion that Brown was tried by a prejudiced jury. Brown fell far short of meeting the requirement recently reiterated by the Supreme Court in Beck v. Washington, 369 U.S. 541, 558,

82 S.Ct. 955, 8 L.Ed.2d 98 (1962) "that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality." In finding that the jury was not impartial, the district judge indulged in just such forbidden speculation, and we must set aside his order.

The Supreme Court's recent decision in Beck v. Washington, supra, makes it clear that the mere fact that jurors have been exposed to adverse publicity does not prove their lack of impartiality where "each indicated that he was not biased, that he had formed no opinion as to petitioner's guilt which would require evidence to remove, and that he would enter the trial with an open mind disregarding anything he had read on the case." Although a majority of Brown's jurors indicated that they had seen or heard some of the news reports concerning the case, they similarly disclaimed any prejudice or partiality, as Judge Timbers' opinion recognizes. We do not agree with Judge Timbers that this is a case, like Irvin v. Dowd, supra, where the circumstances require that little weight be given to the jurors' subjective professions of impartiality. Rather, this is a case like Beck v. Washington, supra, where

"We cannot say the pretrial publicity was so intensive and extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law. Compare Irvin v. Dowd, supra, [366 U.S.] at 723–728, [81 S.Ct. at 1642–1646] where sensational publicity adverse to the accused permeated the small town in which he was tried, the *voir dire* examination indicated that 90% of 370 prospective jurors and two-thirds of those seated on the jury had an opinion as to guilt, and the accused unsuccessfully challenged for cause several persons accepted on the jury. The fact that petitioner

did not challenge for cause any of the jurors so selected is strong evidence that he was convinced the jurors were not biased and had not formed any opinions as to his guilt." 369 U.S. at 557–558, 82 S.Ct. at 964.

Here, as in Beck, the publicity was not contemporaneous with the trial; the last news of which Brown complains appeared on July 28, three full months before the beginning of the trial, and the indications are that none of the jurors had any clear recollection of what the reports had said. See Stroble v. California, 343 U.S. 181, 191–195, 72 S.Ct. 599, 96 L.Ed. 872 (1952). No effort was ever made, in contrast to Beck's case, to have the trial continued until community feeling should subside. Although Windham County is a small community in comparison with Seattle, Washington, the intensity of the publicity here was far less than that concerning Beck. No evidence, other than the conclusory testimony of the interested lawyer Crispe at the change-of-venue hearing, was ever presented to suggest that the Windham County community was permeated with deep and bitter prejudice against Brown, and we see no reason to believe that it was. Indeed, apart from the question of Brown's criminal record which we discuss below, if such routine reporting of the circumstances of a crime and the resulting investigations and proceedings can be said to make impossible a fair trial in the county three months later by jurors selected with the care exercised by the Vermont trial court, it is difficult to see how any important criminal case could ever proceed to trial in the county where the alleged crime was committed.

■ Although, as we have stated, the *voir dire* transcript indicates that no juror had any clear recollection of the contents of any of the newspaper, radio, or television reports concerning Brown, it is possible that some of the jurors might have remembered that Brown had a criminal record; this was, of course, a matter that could not be investigated on the *voir dire* examination because of the certainty of increasing prejudice to Brown. If this had been a federal trial and jurors had admitted to reading contemporaneous reports of a defendant's criminal record, our supervisory power over the administration of federal justice would compel us to reverse. Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). But the mere possibility that such information, made public three months prior to trial, might have remained in the minds of one or more of those who eventually became jurors in the case is not in itself sufficient to raise a *constitutional* infirmity in Brown's conviction under the due process clause of the Fourteenth Amendment. Furthermore, although this subject could not practically have been explored on the *voir dire* examination, there was no reason why testimony as to the extent of public gossip over Brown's criminal record, if such there was, could not have been offered at the change-of-venue hearing, or, indeed, in the federal habeas corpus proceeding. No such evidence was offered.

■ Judge Timbers found that various occurrences during the course of the *voir dire* examination further prejudiced Brown in such a way as to give additional support to his conclusion that the jury which ultimately tried the case was not impartial. We find no substance in these arguments. First, Judge Timbers disapproved of the procedure whereby a certain number of prospective jurors, including some who actually sat, were present during the questioning of others who were ultimately excused. With respect to this, it is sufficient to note that the procedure followed was specifically requested by Brown's counsel at the beginning of the proceeding. Moreover, we find nothing in what transpired during the questioning of the jurors which could have induced prejudice in any juror who heard it; the mere awareness that some of their fellows had such prejudice as to require that they be excused cannot realistically be said to disqualify the jurors finally selected. We also see no justification for the inference of prejudice from the fact that certain of the

prospective jurors who were ultimately excused for cause were earlier permitted to associate with those who were later chosen.

█ Nor do we agree that the fact that some of the jurors had had casual dealings with either the deceased or the defendant was any source of prejudice. Indeed, the record indicates that many of the jurors were also known to defense counsel. Brattleboro is that kind of town and Windham County is that kind of county. In 1960 Brattleboro had 11,522 people and Windham County had 29,776. The defendant had run a drugstore in Brattleboro and the deceased had been a barber in Brattleboro for many years. Of course they were both known to many of the people in the county and to many on the jury panel. It has never been supposed that mere acquaintance with those involved in a criminal case was by itself a disqualification for jury duty. If any such doctrine prevailed it would be impossible in many parts of this country to secure a jury in the county where the alleged crime has been committed.

█ Judge Timbers also indicated disapproval of the questions asked of the prospective jurors by the prosecutor. We find no possible prejudice in the fact that the prosecutor asked some of the prospective jurors whether they had read or remembered news reports mentioning the fire or connecting Brown with it. The questions were surely relevant, and could not have been more carefully phrased to avoid informing or reminding the jurors of any improper matter. They could not be interpreted to communicate anything more than that there had been reports of the fire and that some had mentioned Brown, and they served the commendable purpose of attempting to ascertain whether any of the jurors had developed preconceived notions of guilt from anything they had read or heard. Indeed, Brown's counsel used virtually the same language in questioning other talesmen about the publicity. Equally beside the point are the adversions of the district judge to the State's inquiry into moral scruples concerning capital punishment. In neither of these respects did Brown's counsel raise any objection to the State's questions at any point in the *voir dire* proceedings.

Our examination of the record relating to the selection of the jury discloses no unfairness or likelihood of prejudice. Brown's counsel were given every latitude in questioning, and, in the words of the Vermont Supreme Court, "each prospective juror was ably and exhaustively examined for indications of prejudice by the two experienced counsel for the petitioner."[4] 122 Vt. at 61, 163 A.2d at 847. The court was liberal in excusing prospective jurors for cause, and no juror sat who had been challenged by the defense. We find no support for the district judge's conclusion that "the fountain of justice was poisoned before it began to flow."[5]

█ 2. *Denial of state appellate review*—Judge Timbers held that "denial of state appellate review of petitioner's conviction * * * —following denial of a fair trial by a panel of indifferent jurors—was so unreasonable and so discriminatory as to constitute denial of due process and equal protection in violation of the Fourteenth Amendment." Since we have held that there was in fact no denial of Brown's constitutional rights at trial in any respect of which he has complained, whatever support Judge Timbers' view might have drawn from his

4. Both of Brown's counsel at the *voir dire* proceedings, who have continued to represent him, are former State's Attorneys, and one had also been a Superior Judge.

5. Counsel also challenged the array of jurors on the ground that on the list of jurors there appeared no names of persons of the Jewish faith or race although there were a considerable number of such persons residing within the county. He made no offer of proof, and the court overruled this challenge. Judge Timbers did not rule upon the constitutional question raised in this respect on the habeas corpus petition. There was no evidence that any of the jurors had anti-Jewish prejudice. Indeed Mrs. Allen who sat on the jury not only denied being affected by any possible prejudice but said she then had a Jewish friend staying with her for two weeks. Other jurors made similar responses. We also find no substantial federal question raised by various other claims made by Brown's counsel in the district court but not pressed on this appeal, claims which Judge Timbers refused to consider for apparently the same reason.

belief that the trial was unfair is eliminated. His decision that Brown was unconstitutionally deprived of the right to appeal was, however, based more explicitly on two interrelated elements: (1) his own determination that the actions of Brown's counsel in communicating with various Supreme Court personnel concerning permission to file a notice of appeal *in forma pauperis* and in sending the actual notice of appeal to the clerk of the general term "constituted substantial compliance with the notice of appeal requirement of the Vermont statute," and (2) his conclusion that applying the Vermont statute literally was so harsh as to be unconstitutional, since its double-filing requirement was "unique" among the states, was confusing, was new, having been enacted only in 1959, Acts of 1959, No. 261, § 46, and was subsequently eliminated, Acts of 1961, No. 181, § 1, apparently in reaction to the decision in Brown's case, which also was the apparent cause of an amendment making the filing of a notice of appeal entirely unnecessary in cases of sentences to death or life imprisonment. Acts of 1961, No. 181, § 2, 12 Vt.Stat.Ann. § 2383 (Supp. 1961).

Insofar as Judge Timbers' opinion suggests that the Vermont Supreme Court misinterpreted its own statute, neglecting possibly analogous decisions under the federal rules regarding criminal appeals, it is totally irrelevant to any proper decision on the habeas corpus petition. The highest court of Vermont, albeit by a 3-to-2 vote, has decided in a carefully reasoned opinion that Brown failed to comply with the Vermont appeal statute, and a federal court's review of that decision is limited to a determination whether the statute in itself or as applied was so harsh as to violate those principles of due process imposed upon the states by the federal Constitution. Since there is no showing that Brown was treated any differently from any other appellant, there can be no serious charge that he was denied the equal protection of the laws. Compare Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

However harsh it may seem that Brown should have been deprived of state appellate review on a technicality, the law clearly laid down by the Supreme Court of the United States in Daniels v. Allen, decided sub nom. Brown v. Allen, 344 U.S. 443, 482–87, 73 S.Ct. 397, 97 L.Ed. 469 (1952), requires us to reverse Judge Timbers' decision that the Vermont statute as applied to Brown was unconstitutional. Although Daniels v. Allen dealt with the necessity of exhausting state appellate remedies as a prerequisite to federal habeas corpus jurisdiction, it reached the question whether the dismissal of Daniels' state appeal had been unconstitutional, and squarely held that a state may constitutionally hold a criminal appellant to literal compliance with clearly stated technical requirements for appeal. "The state furnished an adequate and easily-complied-with method of appeal. * * * We cannot say that North Carolina's action in refusing review after failure to perfect the case on appeal violates the Federal Constitution." 344 U.S. at 485–86, 73 S.Ct. at 421. The majority did not accept the argument of the three dissenting justices, 344 U.S. at 557–58, 73 S.Ct. 397, that the state court's failure to exercise its discretionary power to allow the appeal was so arbitrary as to be unconstitutional.

In Daniels v. Allen, the Supreme Court held that it was not unconstitutional for Daniels to be deprived of all consideration of serious constitutional claims because his statement on appeal was delivered to the prosecutor's office on a Saturday rather than before the close of business the day before, although it would have been timely if mailed on Friday (thus being delivered on Saturday or later) and in any event would not have been acted upon until the prosecutor returned on Monday. 344 U.S. at 553, 557, 73 S.Ct. 397. Brown, on the other hand, has never attempted to raise any constitutional issue which has not been fully considered, even assuming that his appeal would have raised substantial issues of state law. The deficiencies in Brown's filing were no more technical than those in Daniels', if as much so. Cf. United States v. Robinson, 361 U.S. 220, 80 S.Ct. 282, 4 L.Ed.2d 259 (1961).

We cannot agree with Judge Timbers that there is anything confusing in the wording of the 12 Vt.Stat.Ann. § 2382 requiring "the filing of a notice of appeal * * * with * * * (2) the clerk or register of the tribunal appealed

from * * *." Nor can we accept his attempt to distinguish Daniels v. Allen on the grounds that in the case at bar the defense partially complied with the statute during the period for filing and that in this and other ways the defense had informally expressed its intention to appeal. Daniels v. Allen makes it clear that it is constitutional for a state to require literal compliance with reasonable rules whether or not failure to comply makes any practical difference under the circumstances or not. That in fact Brown's failure did make some practical difference is made clear by the facts that the trial court had already issued its mittimus before it received the notice of appeal. We see no significance in the fact that the clear requirements of the statute were relatively new and were subsequently eliminated. There is nothing in Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), which induces us to alter our interpretation of Daniels v. Allen.

From a study of the record, including a reading of the minutes of the trial, it seems to us unlikely that there was any substantial claim of error in the conduct of the State trial. Moreover, there was ample evidence to sustain Brown's conviction. We fully agree with the conclusion of the Vermont Supreme Court when it said in its opinion on the new-trial motion, "We fail to find that any injustice was suffered by this petitioner upon trial * * *." 122 Vt. at 66, 163 A.2d at 850. Even the dissenting member of the court agreed that "there is no demonstration that the result reached at the trial was against good conscience * * *." 122 Vt. at 67, 163 A.2d at 851.[6]

The district court is directed forthwith to revoke the order admitting Brown to bail and to direct the United States Marshal to deliver Brown to the custody of the Warden of the Vermont State Prison. We direct our mandate to issue forthwith.

6. Nor are we persuaded by the fact that the federal civil jury brought in verdicts totalling $41,275 against four insurance companies on claims totalling $85,000 and that it found that the fire was not of incendiary origin. At least three witnesses who testified at Brown's trial for the State did not testify at the civil trial. The most

## ON PETITION FOR REHEARING IN BANC

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

PER CURIAM.

All of the active judges concurring, except Judge CLARK and Judge SMITH who vote to grant, the petition for rehearing in banc is denied.

Judges CLARK and SMITH dissent and vote for rehearing in banc so that the full bench may review the entire record in this case, particularly the effect on the possibility of a fair trial of the prosecution's revelation to the press of the defendant's prior criminal record.

important of these was Rosario Amato who died before the civil trial. Amato saw Brown come out of the store and drive away and a moment later he saw smoke coming from the front of the store. Brown himself did not testify at either trial.