**UNITED STATES of America,**
**Appellee,**

v.

**Frank COSTELLO, James "Totto"**
**Marchetti and Arthur Gjanci,**
**Appellants.**

**UNITED STATES of America,**
**Appellee,**

v.

**Frank COSTELLO, Appellant.**

**UNITED STATES of America,**
**Appellee,**

v.

**James "Totto" MARCHETTI, Appellant.**

**UNITED STATES of America,**
**Appellee,**

v.

**Arthur GJANCI, Appellant.**

**Nos. 481–484, Dockets 29524–29527.**

United States Court of Appeals
Second Circuit.

Argued June 8, 1965.

Decided Oct. 29, 1965.

Philip R. Shiff, New Haven, Conn. (Adrian W. Maher, Bridgeport, Conn., on brief), for appellant Frank Costello.

Jacob D. Zeldes, Bridgeport, Conn. (Francis J. King, David Goldstein, Joseph S. Catalano, Bridgeport, Conn., on brief), for appellant Marchetti.

Carroll W. Brewster of Gumbart, Corbin, Tyler & Cooper, New Haven, Conn. (Kimberly B. Cheney, New Haven, Conn., on brief), for appellant Gjanci.

Jon O. Newman, U. S. Atty. (Howard R. Moskof, Asst. U. S. Atty., on brief), for appellee.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge.

These three appeals, along with United States v. Piccioli, 352 F.2d 856, and United States v. Markis, 352 F.2d 860, this day decided, stem from a raid carried out by Internal Revenue Service agents and state police in Bridgeport, Connecticut, on October 8, 1964. Appellants Frank Costello, James "Totto" Marchetti and Arthur Gjanci were tried together and convicted on all counts before Chief Judge Timbers and a jury under four indictments. Three two-

count indictments similar in form charged each of them with violations of 26 U.S.C. § 7203 in that, being engaged in the business of accepting wagers or receiving them for one so engaged, they wilfully failed (1) to purchase the occupational wagering tax stamp required by 26 U.S.C. § 4411 and (2) to register as required by § 4412. The fourth indictment charged all three with conspiring to fail to purchase the occupational tax stamps. Costello and Marchetti received concurrent one-year prison sentences and $10,000 fines in the conspiracy case and under Count 1 of their individual indictments; the imposition of sentence was suspended and probation for two years was imposed under Count 2. Gjanci's sentences differed in that the fine was $2,500.

Certain points are common to the three appeals and, to some extent, to the two others mentioned. After outlining the facts of this case, we shall deal first with these common points and then consider arguments peculiar to various appellants.

In the summer of 1964 Special Agent John Ripa of the I. R. S. was detailed to work in Bridgeport as an undercover agent, posing as a person wishing to make numbers and horse bets and later as a would-be bookmaker. He placed numerous bets with Gjanci and Marchetti at the Lafayette Diner or, in some instances with respect to Gjanci, at the Greek Coffee House. On October 2, he placed bets with Costello, paying with two marked $20 bills which were found in Costello's pocket on the latter's arrest. Earlier, on September 3, he had asked Gjanci if he could set up an arrangement to turn in bets and receive a commission. Gjanci said he would speak to Marchetti to arrange this, and also that he would talk to his "bosses—Totto and Frank" about letting Ripa place bets at a local variety store; Gjanci referred to Costello as the "big boss of Bridgeport." On September 9, Marchetti arranged for Ripa to "book on 50%" with "Tony," with settlement to be made with Marchetti. On several later instances Costello made inquiries and gave directions whence the jury could infer that he was indeed "a boss"—if not indeed "the boss"—in the enterprise. At trial Costello denied any involvement in the wagering business; Marchetti admitted accepting some bets from Ripa but denied others and also denied Costello's involvement; Gjanci did not testify.

## I.

■ Appellants' most basic point concerns the constitutionality of the federal wagering tax. Recognizing that these provisions were sustained in United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953), appellants say their situation differs in two respects. One is that statements of the prosecutor and the judge demonstrated that the purpose of the Government's applying the statute against them was not to collect revenue, concededly the only available source of federal power, but to promote the enforcement of state laws against gambling; the other is that the enlargement of the self-incrimination clause of the Fifth Amendment to include federal compulsion of the admission of crime against the states, see Murphy v. Waterfront Comm'n, 378 U.S. 52, 53 n. 1, 77–78, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), overruling United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931), and recent emphasis that the clause embraces all statements save those that "cannot possibly" tend to incriminate, see Malloy v. Hogan, 378 U.S. 1, 12, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), place the Kahriger holding on self-incrimination in question.[1]

---

1. Marchetti makes an additional argument based on the 1958 amendment, 72 Stat. 1304, which added to § 4401(c) a provision that any person required to register under § 4412 who receives wagers for or on behalf of another without having registered the name and residence of the latter as § 4412(a)(3) requires, shall himself be liable for the tax on wagers to the extent of his receipts. He contends that since § 4412 requires registration by persons required to pay the special tax by § 4411 and § 4411 requires such payment from anyone who is liable for the

■ With respect to the first contention, apart from questions as to what effect on constitutionality statements by prosecutors and judges can have, nothing in the present record goes materially beyond what the Supreme Court characterized in Kahriger as "suggestions in the debates that Congress sought to hinder, if not prevent the type of gambling taxed." 345 U.S. at 27 n. 3, 73 S.Ct. at 512, 97 L.Ed. 754. If "the verbal cellophane of a revenue measure," 345 U.S. at 38, 73 S.Ct. at 518 (dissenting opinion of Mr. Justice Frankfurter), was sufficiently opaque for a majority of the Supreme Court twelve years ago, it remains so for us now. Whether the judge impermissibly allowed considerations unrelated to the nonpayment of the tax to enter into sentence, a claim raised only by Piccioli, is a different problem which we will discuss in the opinion in his case.

■ The contention with respect to the self-incrimination clause would be more serious if United States v. Kahriger stood alone, since whatever the stated basis for decision, the result followed so logically from the now-overruled Murdock doctrine. However, the Court again considered the Fifth Amendment objection in Lewis v. United States, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955), which arose in the District of Columbia where wagering was a crime by federal law. The Court disposed of the argument on the basis that "If petitioner desires to engage in an unlawful business, he does so only on his own volition. The fact that he may elect to pay the tax and make the prescribed disclosures required by the Act is a matter of his choice. There is nothing compulsory about it, and, consequently, there is nothing violative of the Fifth Amendment." 348 U.S. at 422, 75 S.Ct. at 418. If Congress can constitutionally require, as a condition to gambling, a registration that would show an intention to engage in a business prohibited by a federal law, we can think of no reason why it should not have the same power to require registration that would give notice of an intention to engage in activity made illegal by the laws of a state; and the probability of incrimination for future or even past acts, however great, is irrelevant, on the Court's stated theory that the registration cannot be called compulsory. It is true that both Kahriger and Lewis were decided over vigorous dissents by Justices Black and Douglas on the Fifth Amendment point. But we find no subsequent opinion reflecting on the authority or reasoning of these cases and, at least under such circumstances, it is no proper function of ours to speculate on whether the dissent of yesterday may become the decision of tomorrow. Cf. United States v. Zizzo, 338 F.2d 577, 580–581 (7 Cir. 1964), cert. denied, 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435 (1965); United States v. Cefalu, 338 F.2d 582 (7 Cir. 1964). We are therefore not required to consider other arguments on which the Government might rely, such as the lack of any claim of the privilege at an earlier stage, see United States v. Sullivan, 274 U.S. 259, 263–264, 47 S.Ct. 607, 71 L.Ed. 1037 (1927); United States v. Kahriger, supra, 345 U.S. at 32, 73 S.Ct. 510, and the required records doctrine, see Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); Meltzer, Required Records, the McCarran Act and the Privilege against Self-Incrimination, 18 U.Chi.L. Rev. 687 (1951).

## II.

Appellants contend their trial was rendered unfair by publicity, much of it emanating from the Government.

percentage tax under § 4401 or is engaged in receiving wagers for or on behalf of a person so liable, a cross-reference to § 4412 in § 4401 necessarily renders the statute circular and unintelligible. We see no force in this argument. The 1958 amendment did not affect who was required to pay the special tax and to register, see 3 U.S.Code Cong. & Ad.News, p. 4457 (1958); it simply made persons who failed to comply with the special requirement of § 4412(a)(3) liable for the tax on wagers imposed by § 4401, when they would not previously have been.

The indictments against appellants and others were returned in New Haven on October 6, 1964; bail was fixed but the indictments remained impounded, F.R. Cr.P. 6(e), until October 8 at 2:36 P.M. A press release distributed earlier by the Government to newsmen announced in part that at 1:20 P.M.: "In a spectacular thrust at the extensive gambling activities in this area, 75 special agents of the Intelligence Division, with the aid of 50 State Policemen, swooped down on some 40 establishments, arresting approximately 45 persons engaged in such gambling activities as policy numbers and betting on horse races and other sports events, in violation of the Federal wagering tax laws. * * * The special agents were successful in breaking up a large, syndicated operation including some of the most important higher-ups in the gambling syndicate." The release mentioned no names except for saying that appellants were charged with conspiracy, as well as with the two substantive counts employed against most other defendants, and that Costello, Marchetti and a third man had bail fixed at $10,000, $5,000 and $5,000, respectively, while the figure for the other defendants was $2,500. The Government took the newsmen to the I.R.S. headquarters where the latter were able to photograph those who had been arrested as they were brought into custody. There was extensive newspaper, radio and television coverage on October 8 in Bridgeport and elsewhere in Connecticut. On the two following days, the Bridgeport press reported oral statements by Chief Assistant United States Attorney Owens to the effect that the Government had "broken the back of gambling" in Bridgeport, that funds from gambling were supporting prostitution, that housewives had called to express gratitude at the prospective curtailment of their husbands' aleatory propensities, and that Costello and Marchetti had previous convictions for income tax violation.

■ The last statement was improper by any standard and might well be a basis for reversal if appellants had moved for a change of venue or a continuance and this had been denied, and examination of the jurors had revealed recollection of these charges. Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); United States ex rel. Brown v. Smith, 306 F.2d 596, 603 (2 Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1012, 10 L.Ed.2d 11 (1963); see Beck v. Washington, 369 U.S. 541, 555–558, 82 S.Ct. 955, 8 L.Ed. 2d 98 (1962). But appellants did not meet these essential conditions. Being put to plea in New Haven, trial counsel for Costello and Gjanci sought trial in Bridgeport where the publicity had peaked, Marchetti did not object, and no motion for a continuance was made. When the judge examined prospective jurors on November 30, only three of the panel said they had read or heard about the cases, and none of them were chosen. The attack because of the publicity here described came only in a motion in arrest of judgment after the verdict. This was too late; counsel could not speculate on a favorable verdict and then claim lack of "an impartial jury" when the gamble failed.

■ Although another episode as to publicity was properly raised, the objection fails on the merits. On December 3, the first day of actual trial, defense counsel, out of the jury's presence, moved for a mistrial because of an article in the Bridgeport Post of December 1 which reported that "six more suspected gamblers arrested by federal agents last October today submitted guilty pleas" and that Owens said he expected others to change their pleas to guilty. At the request of the United States Attorney and with the consent of defense counsel, the court asked the jury, most of whom came from the New Haven area, whether any of them had read anything about the case or related cases since their selection as jurors. None responded, and the motion was denied. Appellants say the jurors' silence did not necessarily reflect the truth since the jurors would not be likely to admit they had violated the judge's previous

instructions not to read about the gambling prosecutions. Whatever the force of such a contention might or might not be where publicity subsequent to the selection of the jury could be seriously prejudicial, cf. United States v. Agueci, 310 F.2d 817, 831–833 (2 Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963), and cases there discussed, the December 1 article contained nothing that could deprive appellants of a fair trial. If one of appellants had pleaded guilty during the trial, the jury could have been so informed under proper caution. United States v. Crosby, 294 F.2d 928, 948 (2 Cir. 1961), cert. denied, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962); United States v. Dardi, 330 F.2d 316, 332–333 (2 Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964). In the light of that principle it is impossible to see what prejudice could result from a prediction that other defendants, with no relation to appellants save having been seized in the raids of October 8, might change their pleas.

### III.

Ripa's testimony was received over a chorus of objections on the score of the hearsay rule. Whenever he testified as to a transaction or communication with one of the appellants, the others would object to its reception against them as hearsay; when he testified as to transactions or communications with other persons at the instance of one or more of the appellants, all three would object on that ground to its admission against any who were not present.

The objections betray a clear although common misconception of the nature of the hearsay rule. Only in a few instances was Ripa's testimony of declarations from which the jury was to infer the truth of the matter asserted, such as Gjanci's statement that Marchetti and Costello were his bosses. The basis for an objection in other cases, e. g., by Gjanci to testimony that Ripa had placed bets with Marchetti or with "Tony," is not at all that this is hearsay; the testimony of Ripa—himself on the stand subject to cross-examination—chiefly described acts, and no out-of-court utterance of Ripa, Marchetti or "Tony" was being offered to prove the truth of anything asserted in such utterance, 6 Wigmore, Evidence § 1766 (3d ed. 1940); Aikins v. United States, 282 F.2d 53, 57 (10 Cir. 1960); United States v. Annunziato, 293 F.2d 373, 376–377 (2 Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961). The proper objection is that, without more, Ripa's story as to a transaction with one person would not be relevant to prove the crime charged against another.

As the Supreme Court made clear in Lutwak v. United States, 344 U.S. 604, 617–619, 73 S.Ct. 481, 97 L.Ed. 593 (1953), there is a distinction between acts and declarations with respect to admissibility. Out-of-court declarations of an alleged conspirator introduced to prove the truth of the matter asserted meet the obstacle of the hearsay rule. While always receivable against the declarant as an admission, they can be used against others, unless some other exception applies, only on independent proof of agency, see 4 Wigmore, supra, § 1078; and such agency normally does not go beyond statements in furtherance of the conspiracy.[2]

---

2. Since by hypothesis the conspiracy and defendant's participation must be independently established before the hearsay may be used against him, one may wonder at first blush what role remains for the declaration. Making this point, Judge L. Hand in United States v. Dennis, 183 F.2d 201, 230–231 (2 Cir. 1950) (dictum), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), suggested that the conspiracy and participation questions be independently decided by the trial judge and the hearsay then given to the jury without limitation. But even if the judge, as in the Dennis trial and in the present case, charges that the jury must itself resolve this "preliminary" question beyond a reasonable doubt, the hearsay may still be useful to the prosecution, for example, to characterize the conspiracy

Evidence of an act (or a statement offered other than for its truth) has no special evidentiary hurdle to overcome and, whether the act is by a coconspirator or third person and whether it occurs during the period of a conspiracy or not, the evidence is admissible so long as the act is probative of a crime charged against a defendant and the evidence is not excludable on some special ground.[3] Thus, the acts of others not involving the defendant directly may come in against him merely to show the existence of a conspiracy, with which he is to be linked by quite separate proof. An act of any other conspirator during the alleged conspiracy and in furtherance of it almost inevitably meets this test, and, as held in Lutwak, acts by such others even before or after the period of the conspiracy may still be relevant in suggesting its existence and its aims. See United States v. Ross, 321 F.2d 61, 68–69 (2 Cir.), cert. denied, 375 U.S. 894, 84 S. Ct. 170, 11 L.Ed.2d 123 (1963).[4]

■■■■■ Subject to a general point made by Costello which we will mention below, this discussion suffices to dispose of the objections of Marchetti and Costello to the admission of Ripa's testimony as to the placing of bets with Gjanci between July 23 and 31, on the ground that the court had ruled only that a sufficient showing of conspiracy had been made for the period beginning August 12.[5] Even more clearly it disposes of the objection of each appellant to testimony as to conversations and transactions between Ripa and other appellants and nonparties after August 12. Ripa's testimony that Marchetti had called "Tony" and arranged for Ripa to book with "Tony," with Ripa to settle up with him once a week, was plainly admissible against Marchetti and also against the other appellants so far as it might prove Marchetti engaged in a gambling conspiracy to which they might independently be linked. Gjanci's instructions that Ripa should bet with "Carl" and settle with him were admissible on the same basis. Once evidence of these instructions by Marchetti and Gjanci was admitted against appellants, Ripa's testimony that he had then placed bets with Tony and Carl was highly relevant; evidence that the names or telephone numbers led to a gambling enterprise tended to show that the man furnishing the information—and his independently linked co-conspirators—were part of that enterprise. Ripa, in the course of describing

---

as to purpose or date, or as evidence that defendant engaged in another crime for which he is on trial. See generally McCormick, Evidence § 245, at 522 n. 33 (1954).

3. Paralleling the hearsay exception in evidence law—indeed, its very foundation in Wigmore's view, 4 Wigmore, supra, § 1079, at 127–31—is the debated contention that a defendant will be liable for the substantive crime of another upon independent proof that the actor was furthering a conspiracy in which defendant was a member. See Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 993–1000 (1959). No such instruction was given in this case.

4. The briefs exhibit a common confusion in contending that evidence meeting the standard we have indicated would be admissible only under the conspiracy count; such evidence is admissible on substantive counts even when there is no conspiracy indictment at all. United States v. Pugliese, 153 F.2d 497, 500 (2 Cir.

1945); United States v. Annunziato, supra, 293 F.2d at 378; United States v. Smith, 343 F.2d 847 (6 Cir. 1965).

5. We note also that although at the time of the admission of this evidence the court may have been satisfied only as to a conspiracy beginning August 12, other competent evidence later introduced warranted a finding that the conspiracy had existed from July 23 and, indeed, long before. Cf. United States v. Dennis, supra, 183 F.2d at 231. The comments in the text and in this footnote apply also to the objection that the court allowed testimony as to acts subsequent to October 2, the last date to which the judge, in his initial ruling, had found the conspiracy extended. And there is nothing to Costello's special objection to the admission of evidence relating to acts on October 7, the day after the indictment had been found; the impounded indictment did not end the conspiracy, as the evidence obtained in the October 8 raids demonstrated.

his transactions with the appellants and Tony and Carl, naturally told the jury what he himself said or did during the encounters, but this was not to charge his own behavior or statements to the conspirators but simply to provide the necessary context for understanding their conduct which he was relating. United States v. Morello, 250 F.2d 631, 634 (2 Cir. 1957), relied on by appellants, simply held that an out-of-court declaration by an undercover agent acting as a conspirator could not be received against co-conspirators as their admission under the conspiracy exception to the hearsay rule. But as Morello itself indicated, the *act* of a co-conspirator was admissible for whatever it was worth against the defendants, although occurring outside their presence and without their knowledge, so long as their participation in the conspiracy was proved by independent evidence; and the undercover agent's description of his own conduct, apart from the use of his out-of-court statements for their truth, received no censure. 250 F.2d at 634–635.

Costello argues there was no sufficient independent evidence to connect him with the conspiracy, stressing that Ripa did not meet him until September 14. However, Ripa's testimony as to what Costello said and did on that occasion and later, amply justified a finding that Costello was one of the "bosses" and had been so from the outset. With the declarations of Gjanci as to Costello's role thus made competent, the contention that the Government failed to adduce sufficient evidence to warrant submission of Costello's case to the jury falls by the wayside.

■ A final hearsay objection relates to oral and written post-arrest statements by Marchetti, discussed in another context below. These were offered and received only against him. In his charge the judge said that the oral statements were received only against Marchetti, but that the written statement was received against all defendants in the conspiracy case although not in the substantive cases other than Marchetti's.

No exception to the erroneous instruction was taken. It is plain that if one had been, the judge would have corrected his mistake. For reasons fully explained in United States v. Kahaner, 317 F.2d 459, 478–479 (2 Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963), we decline to notice the point.

IV.

As just indicated, Marchetti was interrogated after arrest by a Special Agent, who recorded his oral answers on a question sheet which Marchetti then signed. Apparently Marchetti was first warned of his right not to answer any questions but not of any right to confer with counsel. The agent's testimony and the question sheet were received in evidence against Marchetti without objection. After warning of his right not to answer questions that would incriminate him under federal law, another agent asked Gjanci if he had a federal tax stamp and, this being answered in the negative, why not; Gjanci replied that he didn't accept wagers but "just play[ed] the numbers." No objection to this testimony was made.

■ Marchetti and Gjanci now urge that reception of this evidence violated their rights under the Assistance of Counsel clause of the Sixth Amendment as interpreted in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and under F.R.Cr.P. 5(a) as implemented by McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). The Government contends, *inter alia*, that Gjanci's statement was exculpatory (save as to his stipulated failure to have a tax stamp) and that Marchetti's failure to object was deliberate, since, there being overwhelming proof against him, his sole objective was to protect Costello, as the statement did. We find it unnecessary to examine these contentions. We held some years ago that we need not consid-

**856**

er McNabb-Mallory objections not clearly made at trial, United States v. Ladson, 294 F.2d 535, 538–539 (2 Cir. 1961), cert. denied, 369 U.S. 824, 82 S.Ct. 840, 7 L.Ed.2d 789 (1962). In the course of its *in banc* consideration of a number of cases involving Massiah and Escobedo claims arising out of trials after those decisions, the court has reached the same general conclusion, United States v. Indiviglio, 352 F.2d 276 (2 Cir. 1965), and we find no special circumstances warranting different action here.

We have carefully examined appellants' other claims of error but do not consider them to require discussion. The Court is indebted to Carroll W. Brewster and Kimberly B. Cheney, assigned counsel, for their presentation on Gjanci's behalf.

Affirmed.