**UNITED STATES of America, Appellee,**

v.

**Stephen POLUDNIAK, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Elizabeth E. WEIGAND, Appellant.**

**Nos. 80–2133, 80–2134.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 20, 1981.

Rehearing and Rehearing En Banc
Denied Sept. 14, 1981.

Donald B. Nicholson, Sp. Atty., U. S. Dept. of Justice, Washington, D. C., Terry I. Adelman, argued, Michael W. Reap, Asst. U. S. Attys., St. Louis, Mo., for appellee.

Leonard J. Frankel, argued, Wolff & Frankel, Clayton, Mo., for appellant.

Before LAY, Chief Judge, and ROSS and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

This is an appeal by Stephen Poludniak and Elizabeth E. Weigand, who were jointly charged and tried as defendants in the District Court.[1] The two-count indictment charged, in Count I, a violation of 18 U.S.C. § 875(d), extortion by a telephone call which threatens to injure the reputation of another, and, in Count II, a violation of 18 U.S.C. § 371, conspiracy to commit an offense against the United States. The alleged victims of the extortion and conspiracy were a corporation, Missouri Pipefittings Company, its managing director, J. J. Thyson, and its vice-president and treasurer, Thomas F. Eagleton, a United States Senator from Missouri. Defendant Weigand is Senator Eagleton's niece. For the reasons discussed below we affirm the judgment of the District Court.

Missouri Pipefittings Corporation is a Missouri corporation. After Mark Eagleton, Sr.'s, death, his two sons, Dr. Mark Eagleton, Jr., and Thomas F. Eagleton

---

1. The Honorable H. Kenneth Wangelin, Chief Judge, United States District Court for the Eastern District of Missouri.

owned the company in equal shares. In February of 1970 they entered into a restrictive stock agreement providing that the stock can be sold or transferred only to a person of the Eagleton blood, back to the corporation, or to a third person with the consent of 60% of the shareholders. The agreement further provided that 40% of the income from Missouri Pipefittings is to be retained by the corporation as "shareholder loans," that the taxes on the income will be paid by the corporation, and that there will be a $6,400 payment per year to each shareholder per 6¼% interest in the corporation. The restrictions are to terminate on January 1, 2001.

After the adoption of the restrictive stock agreement, gifts of stock were made to the children of Dr. Mark Eagleton and Thomas Eagleton. Distribution of corporate income to the stockholders is handled by J. J. Thyson, the managing director of the corporation. Each of Dr. Eagleton's children received $6,400 a year from the corporation.

Several times over the next few years the older Eagleton children attempted to learn more about their interest. They generally believed that they were beneficiaries of a trust. Over a period of time, the three older children, Mimi and David Eagleton and Elizabeth (Libby) Weigand, all sought information from Mr. Thyson and also from Senator Eagleton about their holdings, including a copy of the "trust." A meeting was arranged for January 14, 1980, between the children and Mr. Thyson and Senator Eagleton. At that meeting, Senator Eagleton first explained the history of the company, including the 1970 agreement to restrict transfers of stock outside the family. The children were given copies of the restricted stock agreement to review, and Mr. Thyson answered their questions about the agreement.

Soon after this meeting, Libby Weigand hired Alan Steinberg, an attorney, to represent her in her attempt to sell her stock.

After obtaining a copy of the agreement and other documents, Steinberg advised Libby that it was a well-drafted document, that unless the company wanted to buy her out the only way to get her money was to demonstrate mismanagement on the part of Thyson, that the litigation would be expensive, and that he did not have enough information to put a value on her stock. He told her she had a "good deal" and should keep it. During March 1980, Libby asked another lawyer, Stephen Poludniak, to review the document. Steinberg withdrew as Libby's counsel, and Poludniak began representing her. During April Poludniak, accompanied by Ms. Weigand, made several visits to the office of William Buckley, the lawyer representing Thyson in the disagreement with Ms. Weigand over the stock. During these visits they were allowed to read many corporate documents and made copies of some of them.

On May 6, 1980, Poludniak wrote to Buckley and offered a liquidation of Libby's interest in Missouri Pipefittings for $220,000. This figure included a sale of her 6¼% interest and an unconditional release of her shareholder loans, estimated at approximately $150,000.[2] In response, Mr. Buckley sent a letter from Mr. Thyson stating that the company would not buy her interest. After that, Poludniak continued to request and receive documents until June 27, 1980. From that date there was no further contact until July 25, 1980.

In early July Mimi Eagleton returned from a wedding in Florida and told Libby that she had heard some gossip about their uncle, Senator Eagleton, involving his conduct during trips to Florida. Libby testified that the gossip struck her as "wild, preposterous, and ridiculous" and that she did not know whether it was true or false. She told Stephen Poludniak about the gossip.

At about the same time, Libby attempted several times to contact her uncle, Senator

---

**2.** The "shareholder loans" were actually corporate income reinvested in the corporation at the rate of 40% per year as required by the restrictive stock agreement. Mr. Thyson had discretionary power to make additional distributions to the children from undistributed income. He had done so from time to time for college tuition and other expenses.

Eagleton, by telephone. When they finally talked, the Senator told her he would not interfere with Mr. Thyson's decision on the stock sale. He testified that he had not wanted to talk to her because she already knew his position on the subject, and there was nothing more to be said.

Libby then wrote a note to her uncle dated July 10, 1980, which was conciliatory in tone but contained a veiled reference to the gossip Mimi had heard in Florida. Libby consulted Poludniak before putting in the reference to Florida, and they decided to include it to see if it "got a rise" out of the Senator.

On July 16, 1980, Libby left for a trip to California, and she and Poludniak testified at trial that they agreed that he would continue to represent her in the Missouri Pipefittings matter and do what he could. They both testified that they had no direct contact with each other between July 16, 1980, and August 1, 1980. On July 25, Poludniak called Buckley and told him that Libby had hired investigators in California and had uncovered irregularities concerning the company, Senator Eagleton, and Mr. Thyson. He said that if Buckley did not want to talk to him about it, the media would. Poludniak mentioned that it was an election year, and that the information could be damaging. Poludniak and Buckley met at Buckley's office on July 29, 1980. Buckley recorded the meeting. Poludniak again mentioned corporate irregularities, and said also that Libby had documented evidence about the Senator's activities in Florida. After consulting with Mr. Thyson and Senator Eagleton, Buckley called the F.B.I. Subsequent conversations were recorded by F.B.I. agents.

On July 31, Poludniak called Buckley and reported that he had received the information from Libby in California and that it was very damaging to the Senator. He also reported that he had made appointments to release the information to Roy Pfautch, campaign director for Senator Eagleton's opponent, and John Spano, the City Editor of the *St. Louis Globe-Democrat.* Defendants' testimony at trial was that a number of statements made by Poludniak to Buckley were not true. There were no investigators hired by Libby in California, and, therefore, no damaging information had been sent to Poludniak by Libby. Poludniak had, however, called Pfautch and Spano and attempted to make appointments with them to release the non-existent damaging information about Senator Eagleton. Buckley met with Poludniak later that day and asked how much money Libby wanted. The response was $220,000 in cash. Buckley emphasized that the corporation still did not want to buy Libby out and was considering doing so only in order to prevent release of any derogatory information in her possession. Buckley told Poludniak that the hints about Florida did not register with the Senator and that they were not willing to turn over the money without knowing what kind of information Libby had.

In the meantime, Poludniak called Scott Weigand, Libby's husband, to report that Mr. Thyson would probably want to talk to Libby, and that she was to stand by in California for a telephone call on August 1. Scott Weigand called his wife on July 31 and reported what Poludniak had told him, including the instruction that she was to pretend that she had hired investigators in California.

Thyson, Buckley, and Poludniak met, as planned, on August 1. Poludniak repeated his earlier statements that Libby intended to release some of the material before the primary election on August 5, 1980, and some more of it before the general election, unless she got the money. Buckley and Thyson repeated their earlier contentions that they were unwilling to give Libby the money unless they knew specifically what information Libby had. Poludniak then refused again to reveal any specifics but said (falsely) that it involved both personal misconduct and official misconduct in office. Thyson told him again that the Florida clue had not registered with the Senator. Poludniak then called Libby in California, and she and Thyson had the following conversation.

THYSON: All right. Uh Libby uh sometime ago you said you wanted to sell all of your interest in MoPipe for 220 thousand dollars.

LIBBY: Right.

THYSON: And I told you that uh, uh it was not in accordance with the family plan for you to get 220 thousand dollars at this time.

LIBBY: Uh Huh.

THYSON: And you then, nevertheless that's what you wanted. Now you have come along and say that you have assembled material uh, that if I do not buy you out you're going to release that material to the press. Is that your intention?

LIBBY: Uh Huh.

THYSON: It is. Now uh because I don't intend to buy you out unless it involves this material. Is that clear?

LIBBY: Uh say that again?

THYSON: I say I, I have told you I wouldn't buy you out and I, I'm telling you that again and what has changed my mind.

LIBBY: Yeah.

THYSON: Is this material?

LIBBY: Okay.

THYSON: All right. Now is it not reasonable that I see that. Otherwise I'm buying a pig in a poke. I understand it involves your uncle.

POLUDNIAK: Libby, I have indicated to Mr. Thyson uh that we have talked uh numerous times about that and that it's your position that uh, uh because you, you believe that your uh, uh uncle knows what you have that there just isn't any reason to uh, uh to

LIBBY: Right.

POLUDNIAK: disseminate it or distribute it.

. . . . .

THYSON: Now is that what you're talking . . .?

LIBBY: No. See to tell you the truth I really, I'm not planning, I'm not gonna tell you anything, you know.

THYSON: All right.

LIBBY: So . . .

THYSON: All right. Am I, am I going to see anything? Are you gonna give me a sealed envelope?

LIBBY: Yeah. I mean if, if everything works out between us sure. You know I'll give you what I've got but until that time, no.

THYSON: And will you give me all you've got?

LIBBY: Definitely. I mean, see, I'm not, it's like I'm not trying I don't wanna, to destroy Tommy or anything okay. I want, I want what I want and I wanna get out and this is obviously the only way I can do it. So you know once everything is taken care of I will give you what you want. I will not, you know, that's the end of it for me. That's fine. I don't plan on you know, holding back information and using it, you know, for future means or you know, anything like that.

It was decided that Libby would have to return from California to close the sale. Later that day the three men went to the Mercantile Bank, where a cashier's check was drawn made payable to Elizabeth Weigand for $220,000.

On Sunday morning, August 3, 1980, Libby flew back from California and met with her husband and Poludniak in his office. There was a conversation regarding the legality of their actions, and Poludniak told both Libby and her husband that he had researched the issue and that he was convinced that what they were doing was proper. Poludniak instructed Libby to write out in her hand three notes which would appear to be notes that she had taken while talking to investigators in California. Poludniak wrote them first and then Libby copied them in her handwriting. One note dealt with alleged personal misconduct, one with contributions to the Senator's campaign, and one was about Thyson and referred to certain bank accounts he had. As the defendants later testified, the contents of the notes were pure fabrication with no basis in fact. Neither defendant ever in fact had any evidence of any impropriety on the part of Senator Eagleton. The three notes, along with photographs of corporate rec-

ords, were sealed in a manila envelope and placed in Poludniak's briefcase.

Later that day Libby and Poludniak met with Thyson and Buckley at the Missouri Athletic Club in St. Louis. The meeting was recorded by F.B.I. agents. Buckley and Thyson refused to transfer the $220,000 because Poludniak would not allow them to see the contents of the manila envelope. Poludniak and Weigand were arrested outside the club, and the briefcase containing the manila envelope was seized pursuant to a search warrant. Defendants were released without being charged a few hours later. The indictment was filed September 9, 1980, and the case was assigned to Chief Judge H. Kenneth Wangelin. The trial commenced on October 14, 1980, with the voir dire of the jury. Testimony began on October 16, 1980, and the case was submitted to the jury on October 24. The jury returned verdicts of guilty as to both defendants on both counts of the indictment. Poludniak was sentenced to four years' imprisonment on Count II, with a suspended sentence on Count I. Ms. Weigand was committed to the custody of the Attorney General under the Youth Correction Act, 18 U.S.C. § 5010(b).

Defendants present seven issues to this court:

1. Whether the trial court erred in denying defendants' motion to disqualify all of the United States District Judges for the Eastern District of Missouri.

2. Whether the trial court erred in denying defendants' motions for change of venue.

3. Whether the trial court conducted a sufficient voir dire examination.

4. Whether the trial court erred in denying the defendants' motions for judgment of acquittal.

5. Whether the trial court erred in allowing the documents containing the allegedly damaging material to be read to the jury.

6. Whether the court's instruction on advice of counsel was sufficient.

7. Whether the trial court erred in failing to hold a hearing on the accuracy of the Probation Office's estimate, in the presentence report, of the offense-severity rating that the Parole Commission would be likely to assign to defendants for purposes of applying its guidelines for release on parole.[3]

Disqualification of the Eastern District Judges

Defendants' first assignment of error initially arose out of an unrelated incident. Prior to trial in this case, a state prisoner escaped from custody in the United States Court and Custom House in St. Louis while entering the building to appear in a civil-rights suit. The security problem was reported in the *St. Louis Post-Dispatch* three weeks before defendants' trial began. The article included comments from Chief Judge Wangelin about the need for tighter security and more guards. The following sentence was included:

Wangelin said he hopes to talk to Missouri's U. S. Senators this week to see whether he can get money to hire more marshals. "God only knows that we need them" he said.

*St. Louis Post-Dispatch*, Sept. 21, 1980, p. 10C.

▮ Immediately above the security article was an article about the present case. The story, primarily discussing defendants' motion for a change of venue, mentioned that the case was assigned to

---

**3.** Defendants have asked this court to remand the case to the District Court for a hearing to determine whether the offense-severity rating recommended by the United States Probation Office is correct. This issue is inappropriate for consideration on a direct appeal of defendants' convictions. Final determination of the offense-severity rating, which is a factor used in determining a defendant's proposed release date, is made by the United States Parole Com-

mission after incarceration. Defendants contend that the District Court may have been influenced by the "Very High" rating in setting their sentences. Judge Wangelin stated during the sentencing hearing, however, that he was not bound by the ratings and recommendations of the Probation Office. He suggested that defendants make their argument to the United States Parole Commission, and we agree with that recommendation.

Chief Judge Wangelin and that Senator Eagleton was the victim of the alleged attempted extortion. The next day defense counsel moved for the disqualification of Judge Wangelin and all other district judges for the Eastern District. The claim is that, under the circumstances, the judges' impartiality might reasonably be questioned.

28 U.S.C. § 455(a) provides:

Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

This section, as revised in 1974, requires the use of an objective standard of reasonableness in a judge's disqualification decision. *United States v. Ritter*, 540 F.2d 459 (10th Cir.), *cert. denied*, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976). Since the goal of the judicial-disqualification statute is to ensure not only actual impartiality, but also the *appearance* of impartiality, it is not necessary that actual bias or prejudice be present before disqualification is required.

[A] judge faced with a potential ground for disqualification ought to consider how his participation in a given case looks to the average person on the street. Use of the word "might" in the statute was intended to indicate that disqualification should follow if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality.

*Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980).

■ Applying the above standard of reasonableness, we conclude that there was no error in Judge Wangelin's failure to disqualify himself and the entire bench of his district. Although we agree that the juxtaposition of the two articles was unfortunate, we do not see how the judge's comments on the need for better security in the federal courthouse can require disqualification. Judge Wangelin was speaking in his official capacity as Chief Judge of the Eastern District of Missouri when he stated that he would soon be talking to Missouri's senators in Washington about securing additional funds for security. Courthouse security is his responsibility, and, like all branches of government, he and his district must rely on Congress for money. To carry defendants' argument to its logical conclusion would suggest that all federal judges would have to disqualify in cases involving members of Congress, because they might appear to be partial to those who have the power of the purse. In addition, Senator Eagleton is not a party to this action. He was the victim of the alleged crime, not a litigant whose own actions brought him to court.

We hold that a reasonable person, knowing all the circumstances, would conclude that Judge Wangelin was, at the time he made the statement, legitimately concerned about the escape of a convicted murderer within the courthouse, and would not conclude that the Judge appeared to be partial to the Senator and his participation in defendants' trial as a witness.[4]

### Change of Venue

Both defendants moved for a change of venue prior to trial or, in the alternative, to

---

4. The newspaper story at issue was entitled, "U. S. Judge Encountering Problems in Tightening Courthouse Security." The first two paragraphs read:

Federal judges here are continuing to study way to tighten security at the U. S. Courthouse, 1114 Market Street, but no easy or inexpensive solutions are in sight, says Chief District Judge H. Kenneth Wangelin. Courthouse security has been a major concern for the judges and other court officials since Aug. 11, when convicted murderer Dennis Kirksey escaped as he was being taken into the building to testify in a civil rights trial. Kirksey has not been recaptured.

Judge Wangelin went on to explain five plans being discussed to solve the security problem. The reference to talking to Missouri's senators about hiring more marshals is in the seventh paragraph of the eight-paragraph story. We recount all of this detail to show that the article is not primarily about the judge's asking the senators for more money, but rather concerns an on-going study of proposals to improve security at the federal courthouse. It may be noted, in addition, that every member of this Court has chambers in the same building. The statute should not be interpreted to require disqualification on such a chimerical theory.

have non-Missouri residents called as veniremen. The motion to bring in non-Missouri veniremen was denied. Ruling on the motions for change of venue was reserved pending voir dire. Defendants contend on appeal that their motions to move the trial outside the State of Missouri because of extensive pretrial publicity should have been granted during the pretrial period. Neither defendant asked for a continuance to allow the publicity to subside, as it might have done after the general election in November. Instead, the defendants insisted on a speedy trial, which was their right, and pressed for removal to another state.

This Court has repeatedly held that it is preferable to await voir dire before ruling upon motions for change of venue.

> Mere exposure to publicity or the formation of tentative impressions by some jurors is not enough to require a change of venue. The ultimate test is whether he or she can set aside any impression or opinion resulting from that exposure and render a verdict based solely on the evidence presented at trial.

*United States v. Brown,* 540 F.2d 364, 378 (8th Cir. 1976). *Accord, e. g., Blumenfield v. United States,* 284 F.2d 46 (8th Cir. 1960), *cert. denied,* 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692 (1961).

Certainly there was extensive publicity in this case from August 3, 1980, when defendants were arrested and released, until the trial in October. Any case involving a public figure, particularly one who is running for office, will attract the attention of the media and the public. We agree with the District Court that the pretrial publicity was not so extensive as to create a presumption that an impartial jury could not be seated. There was no abuse of discretion by refusing to rule on the transfer motion before voir dire.

A related argument, not raised in defendants' brief in this Court, was also stated in their joint motion for a change of venue. That argument is that it would be inappropriate to try the case in Missouri, because Senator Eagleton represented all of the potential jurors. Defendants contended below that this unusual circumstance created a grave risk that they would not receive a fair and impartial trial. We think this question is answered by the voir dire, which is discussed later in this opinion. Each potential juror was questioned individually about his political affiliations and attitude toward Senator Eagleton as a witness. Each was asked if he had ever worked for or against the Senator in a campaign and whether he had ever requested or received assistance from the Senator's office. Jurors were then asked whether they would be inclined to believe him any more or less than any other witness and whether they had any strong feelings for or against him. Satisfactory answers were given to these questions.

Defendants had submitted a more extensive set of questions on Senator Eagleton, but they do not now contend that the voir dire was inadequate on this topic. They do not allege any actual prejudice on the part of the jury, and there is no hint in the transcript of the voir dire that the jurors were prejudiced either for or against Senator Eagleton. Since no prejudice has been shown, we hold that the denial of change of venue was appropriate.[5]

### Adequacy of the Voir Dire Examination

Closely related to defendants' argument on change of venue is their argument that an inadequate voir dire deprived them of the chance to determine whether the jurors

---

5. The point was raised at oral argument that it was not possible to question the panel adequately on this topic, because it would be improper to ask a juror whom he voted for in any election, what political party he belonged to, or whether he had contributed to political campaigns. If that is true, the argument goes, it would be impossible either to prove or disprove prejudice. The trial, therefore, should have been moved out of the State of Missouri. This

is an admittedly unusual situation, but we cannot subscribe to the theory that difficulty in proving prejudice is tantamount to proof that it exists. Defendants are assuming that Senator Eagleton's status as a public figure assured partiality towards him by the jury panel. It is just as possible that his position could cut the other way. While those who admire him might conceivably want to help him, those supporting his opponent might desire the opposite result.

were fair and impartial. Defendants requested three particular types of questions: questions regarding the juror's political affiliations, questions about religious beliefs,[6] and questions as to the content of articles and newscasts to which the jurors had been exposed. If a juror mentioned the Church of Scientology in describing the content of articles he had read, then the defendants wanted the court to ask more detailed questions about the church. On appeal their voir dire argument focuses on the court's refusal to allow examination on the contents of the articles read by the jurors.

Questioning by the Court on the sensitive issues of pretrial publicity, political affiliations, and the Church of Scientology was conducted on an individual basis. On the subject of pretrial publicity, the Court asked the following questions:

Q. [To Juror Number 3] What type of media coverage have you been exposed to in this case and by that I mean, have you seen TV, read newspapers, listened to the radio or any combination of the above?

Q. Newspaper only. What newspaper?

Q. How many articles have you read in the *Globe*?

Q. Did the publicity make a strong impression on you?

Q. Do you remember any particular details?

Q. Based on this publicity that you have heard or read, have you formed an opinion about this case as to the guilt or innocence of either of the defendants?

Q. Could you set aside any publicity that you have heard or read about this case and merely decide the case on the evidence in this courtroom?

Q. And on the instructions of the law that I give you?

Q. Have you ever discussed the case with friends or acquaintances?

Out of the fifty veniremen questioned, all but three remembered hearing about the case, but only one had formed any opinion about it. Three others said that they remembered details of the publicity. All forty-four who remained after six were dismissed[7] stated that they would be able to decide the case on the evidence produced in the courtroom.

Defendants claim the right to ask "content" questions regarding pretrial publicity, relying on *Silverthorne v. United States*, 400 F.2d 627 (9th Cir. 1968). The court in *Silverthorne* found a voir dire inadequate because the trial court relied solely on the jurors' subjective evaluation of their own ability to set aside their preconceived notions of defendant's guilt. Almost 30% of the panel thought the defendant was guilty, and under those circumstances the Ninth Circuit thought the trial court should have sought some more objective information. *Id.* at 639. In addition, the trial court in *Silverthorne* did not inquire as to the source of the pretrial publicity or the extensiveness of each juror's exposure. That is not the case here. Even without questioning the jurors on the contents of the articles, the District Court had ample objective criteria for judging the partiality of the panel. Each juror was asked individually (1) what types of media coverage he had seen or heard, (2) how many telecasts he had seen or newspaper articles he had read, (3) what television, radio stations, or newspapers were the sources of the information. These questions, when coupled with the questions on impact of the publicity, details remembered, and impressions formed, provided both the court and the defendants with an adequate basis for applying the ultimate test: Whether the jurors had been exposed to pretrial publicity and, if so,

6. There was some suggestion that Libby intended to donate all or part of the money she received from the sale of the stock to the Church of Scientology. It was important, therefore, to determine whether any panel member was prejudiced against this church.

7. Six jurors were excused. One was challenged for cause because of active political affiliations and another expressed negative feelings about the Church of Scientology. None of defendants' challenges for cause was overruled.

whether they could set aside any impression or opinion resulting from that exposure and render a verdict based solely on the evidence presented at trial. *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). We also note that in *United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), the District of Columbia Circuit approved the denial of content questions concerning pretrial publicity in one of the "Watergate" trials. That court found detailed inquiry into sources and intensity to be adequate. *Id.* at 69.

Defendants also object to the court's questioning of the jury panel on the subject of the Church of Scientology. Although we doubt that this issue was properly preserved in the District Court, we will address it nevertheless, in order to assure ourselves that an injustice has not been done.

The court asked the following set of questions about the Church of Scientology, tailoring the questions to fit the responses.

Q.  Now, I want to ask you some questions about the Church of Scientology. Have you ever heard of the Church of Scientology?

Q.  The defendants have been members of that church and I want to know if that would affect you either way?

Q.  Do you have any close family members or friends who are members of the Church of Scientology?

Q.  You don't know anything about them?

Q.  About their teachings, philosophy, or anything?

Most of the jurors had never heard of the Church of Scientology, and those who had could not remember any specific information about its teachings or philosophy. The one juror who identified it as a cult and expressed a disapproval of cults was later dismissed for cause with the consent of both sides. Defendants argue that the mere mention of the church was enough to deny them a fair trial. They had earlier filed a motion in limine seeking to prevent the government from mentioning the church

during the trial. The motion was denied, but the government did not explore the defendants' connections with the church during the trial. The church was mentioned only once, during the examination of Mr. Thyson.

The court's decision to question the panel about the Church of Scientology was not an abuse of discretion. Both sides had a right to know if any jurors had strong feelings about this church. It is the court's duty to ensure that the defendants receive a fair trial and to neutralize the effect of any known prejudice. *United States v. Bear Runner,* 502 F.2d 908 (8th Cir. 1974). Had the court not questioned on this topic, and had there then been testimony about the church during the trial, the stage would have been set for a claim of error. Defendants have demonstrated no actual prejudice arising from these questions.

Defendants additionally contend that the voir dire was so inadequate that they were unable to exercise their peremptory challenges effectively. We have read the 197 pages of transcript of the voir dire and cannot agree. The voir dire examination took the better part of two days, and there is every indication that the court did its best to seat an unbiased jury. We find no error.

### Sufficiency of the Evidence

As their fourth point for reversal, defendants contend that the Court erred in failing to grant their motions for judgment of acquittal as to Count II of the indictment on the ground that the evidence failed to prove the existence of a conspiracy as a matter of law. Defendants argue that no agreement was shown and that they lacked the requisite knowledge and intent.

Libby Weigand had been trying since January 1980 to convince her uncle and Mr. Thyson to buy her 6¼% interest in Missouri Pipefittings. An offer was made by Stephen Poludniak in her behalf in May. She had been repeatedly told by Senator Eagleton or his representatives, Mr. Thyson and Mr. Buckley, that the company would not buy her stock.

The government's position is that the conduct of both defendants was legitimate up until July 25, 1980, and that the illegal activities began after that date. Ms. Weigand contends that since she was in California on that date and had no knowledge of Poludniak's threats to release information, there could be no agreement on her part to extort. The answer is that her later acts of complicity were ample evidence from which the jury could have found that she and Poludniak acted in concert. In the August 1 telephone conversation with Thyson from California she confirmed her intention to release damaging information against her uncle unless the company bought her stock. On August 3 she wrote the allegedly damaging material in her own handwriting and accompanied Poludniak to the Missouri Athletic Club, where they intended to exchange the "information" for the $220,000 check. Poludniak testified at trial that the scheme was all his idea. That may well be, but the scheme became a conspiracy when Ms. Weigand participated in the telephone call from Thyson on August 1. It is not necessary for the government to show who thought up the scheme, or that Libby did or did not know specifically what Poludniak was up to before her husband called her in California on July 31. Having reviewed the complete trial transcript, we conclude that there was ample evidence from which the jury could have found that the defendants conspired to commit extortion.

Defendants also challenge the sufficiency of the evidence that both conspirators possessed the required intent to conspire and to commit the substantive offense. They both testified that they believed their activity was conducted in good faith without any criminal intent, in order to obtain money for Ms. Weigand's interest in Missouri Pipefittings after Thyson and Senator Eagleton had refused to deal with them on any other basis. Poludniak testified that he had researched the United States Code Annotated and was convinced that what they were doing was completely legal. He further testified that on the morning of the attempted exchange he assured both Ms. Weigand and her husband that they were not committing a crime. Libby testified that she relied on the advice of counsel and had no idea that what they were doing was against the law.[8]

This argument also fails. Defendants both admitted doing all the acts cited by the government as "overt acts" in furtherance of the conspiracy. There was no claim of accident or mistake; they admitted that they made the threats in order to get the money. It was for the jury to decide whether to believe that the defendants thought their actions were legal. The jury was correctly instructed on specific intent (defendants do not quarrel with those instructions), and defendant Weigand *had the additional advantage* of her advice-of-counsel argument. The jury was instructed that the government must prove that defendants acted willfully, with specific intent "to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law." The jury was also correctly instructed that there is a presumption that every person knows what the law forbids, but that ignorance of the law is to be considered by the jury in determining whether or not the defendants acted or failed to act with specific intent. The jury had ample opportunity to consider this issue and apparently rejected defendants' contentions. We will not disturb that verdict.

### Reliance on Advice of Counsel

Defendant Weigand contends that the Court's instruction on advice of counsel was erroneous and confusing. The Court gave the following instruction:

The defendant Weigand claims that she is not guilty of willful wrongdoing because she acted on the basis of advice from her attorney.

Advice of counsel is not a defense to the crimes of conspiracy or extortion. It is only a circumstance that may be considered in determining whether the defendant acted in good faith and lacked specific intent to violate the law.

---

**8.** The court's instruction on advice of counsel will be discussed below.

If the defendant before taking any action sought the advice of an attorney whom she considered competent, in good faith, and for the purpose of securing advice on the lawfulness of her possible future conduct and made a full and accurate report to her attorney of all material facts of which she has the means, and knowledge and acted strictly in accordance with the advice of her attorney given following her full report, then the defendant would not be willfully doing wrong in doing something the law forbids, as that term is used in these instructions.

Whether the defendant acted in good faith for the purpose of seeking guidance as to the questions about which she was in doubt, and whether she made a full and complete report to her attorney, and whether she acted strictly in accordance with the advice received are questions for you to determine.

Advice of counsel does not under all circumstances confer complete immunity on a defendant. If this were the law a defendant could insulate herself from prosecution by having a lawyer tell her that a particular course of conduct was legal, no matter how violative of the law that conduct was and regardless of the consciousness of wrongdoing or unlawfulness on the defendant's part and on her lawyer's part. No such legal doctrine exists. No one can willfully and knowingly violate the law and excuse herself from the consequences by claiming that she followed advice of counsel.

The trial court also submitted defendant Weigand's "position" instruction to the jury, as follows:

It is the position of the defendant Elizabeth Weigand that she is not guilty of either count of the indictment for the following reasons: (1) Defendant Elizabeth Weigand did not have the specific intent to commit a crime as further

defined in these instructions; (2) Defendant Elizabeth Weigand did not act willfully in that she acted upon advice of counsel as further defined in these instructions.

■ Ms. Weigand's specific objection is to the first sentence in the second paragraph of the Court's instruction: "Advice of counsel is not a defense to the crimes of conspiracy or extortion." This statement has been approved by the Ninth Circuit as a correct statement of the law when the instructions as a whole make it clear that the advice should be considered in determining whether the defendant's actions were willful. *United States v. Taxe*, 540 F.2d 961 (9th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). We agree. The statement that advice of counsel is no defense is a shorthand statement of the acknowledged rule of law that advice of counsel cannot be a defense to a willful and knowing violation of law. "[N]o man can willfully and knowingly violate the law, and excuse himself from the consequences thereof by pleading that he followed the advice of counsel." *Williamson v. United States*, 207 U.S. 425, 453, 28 S.Ct. 163, 173, 52 L.Ed. 278 (1908). *See also Tarvestad v. United States*, 418 F.2d 1043 (8th Cir. 1969), *cert. denied*, 397 U.S. 935, 90 S.Ct. 944, 25 L.Ed.2d 116 (1970). Defendant's position was amply presented to the jury. In both the "advice of counsel" instruction and the "position" instruction, the jury was told that she claimed that she did not act willfully because she acted upon advice of counsel. The "advice of counsel" instruction told the jury that a defendant acting on advice of counsel in good faith, after full disclosure of all facts, "would not be willfully doing wrong in doing something the law forbids, as that term is used in these instructions." [9]

9. If there is any error in the handling of the advice of counsel issue, it is error in Ms. Weigand's favor. The advice of counsel issue is appropriate only in a limited class of cases in which willful action is an essential element and legal problems are present. "A defendant is entitled to this instruction only if his proposed conduct presents a substantial legal problem, so that he requires legal advice in resolving it." Devitt & Blackmar, *Federal Jury Practice and Instructions* § 14.12 (3d ed. 1977).

### Admission of Prejudicial Evidence

Defendants finally contend that it was error for the Court to allow the reading into evidence of Exhibit 27(a), a handwritten note (falsely) describing evidence of supposed personal misconduct in Florida by Senator Eagleton. The note, along with two others, was read to the jury by Senator Eagleton during the government's case in chief. Defendants opposed the admission of the note and stipulated that Libby Weigand had written the note.

The alleged error is that the Court failed to apply the balancing test of Fed.R.Evid. 403. Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Defendants claim that the contents of the note were unnecessary to proof of the government's case and so prejudicial to defendants that any probative value was substantially outweighed by unfair prejudice to defendants.

■ This argument is without merit. Both defendants claimed lack of specific intent and lack of an agreement as their defense. The writing of the notes was an integral part of the scheme and strong evidence of Libby's involvement with Poludniak. Without knowledge of the contents of the notes the jury had only the vague references to personal misconduct in Florida before it. We do not think that the government should be limited merely to stating that defendants threatened to release "damaging information," particularly when defendants admitted that the allegedly damaging information had no basis in fact. The content of the note gives meaning to the vague references in Ms. Weigand's telephone conversation with Thyson and makes it clear that she was threatening to damage the Senator's reputation. We see no error in the admission of the note into evidence or in the manner in which it was introduced.

The judgments are affirmed.

LAY, Chief Judge, dissenting:

I respectfully dissent. It is my view that the defendants were denied a fair trial and that the district court erred in failing to grant the defendants' pretrial motion for change of venue.

Senator Tom Eagleton represented all the potential jurors drawn from the general electorate in the State of Missouri. The trial was held approximately two weeks before the general election in which he was running for one of the highest offices in the nation. The majority opinion correctly suggests that the defendants could have moved to continue the trial until after the election. Yet, surely these defendants were not required to select between their constitutional right to a speedy trial and a fair one. Each of the potential jurors belonging to the general electorate had undoubtedly formed before the trial a personal impression of Senator Eagleton based upon the Senator's many years of service to Missouri. In my judgment it was clear error for the trial court to assume that potential jurors could fully set aside these impressions in a trial where the Senator was a central figure. Such an assumption is totally unrealistic. This case involved the Senator's reputation for truth and veracity as much as it did the defendants'. The Senator's word was on trial as much as the defendants'. If Senator Eagleton had been the defendant charged, there can be little doubt that under such circumstances the court would have granted a change of venue if he had moved for one. The trial judge's attempt to question the potential jurors in camera demonstrates his own concern that a fair selection of a jury could be troublesome.[1] *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). It is clear to me that the motion for change of venue should have been granted. Any other ruling must speculate as to possible unknown prejudice; that is something to which no defendant in a criminal case should ever be subjected.

---

1. See In re United States ex rel. Pulitzer Pub. Co., 635 F.2d 676 (8th Cir. 1980).

It is argued that change of venue was not needed because the voir dire examination of potential jurors gave no hint of prejudice for or against Senator Eagleton. Although voir dire can uncover prejudice among potential jurors, the absence of prejudicial answers cannot be equated with the absence of prejudice. A juror may consciously or subconsciously harbor prejudice and bias on sensitive subject matter. The nod of the head in response to the basic inquiry of "Can you be fair?" should provide little satisfaction in a case electrified by sensitive issues such as the one at bar. It should be obvious that such prejudice cannot always be elicited by merely questioning the jurors. *Cf. Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1961); *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *United States v. Davis*, 583 F.2d 190, 197 (5th Cir. 1978); *United States v. Williams*, 568 F.2d 464 (5th Cir. 1978); *United States v. Bear Runner*, 502 F.2d 908 (8th Cir. 1974); *United States v. Engleman*, 489 F.Supp. 48 (E.D.Mo.1980); *People v. McKay*, 37 Cal.2d 792, 236 P.2d 145 (Cal.1951) (Traynor, J.); *American Bar Ass'n Project Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press*, § 3.2, Commentary at 121–28 (Approved Draft 1968); Broeder, *Voir Dire Examinations: An Empirical Study*, 38 S.Cal.L.Rev. 503 (1965).

The trial court was not dealing with the normal criminal case. A popular incumbent such as Senator Eagleton will always be in the news, but surely the trial court should have considered the massive amount of public attention he received as the election drew near. Any political election and the resulting publicity are likely to create a supercharged atmosphere. Tenacious sides are drawn not only as to issues, but also as to individual personalities of the candidates. Politics creates intense interest in many citizens; emotions can run high and some of the citizenry may possess an almost religious fervor as an election draws near. Man's political nature is basic to his existence. It was once said "neither philosophy nor policy can shut out the feelings of nature." J. Story, *Miscellaneous Writings* 80.

Political beliefs, much like religious convictions, are one's own business. There was little likelihood, as both sides concede, that these beliefs could be subjected to cross-examination. Once this was acknowledged, it should have been obvious that Senator Eagleton was the central focus of each individual juror's political belief.

The majority is persuaded that those who disliked Senator Eagleton could balance out those who support him. However, a man who is reelected to the Senate three times is unlikely to have as many detractors as supporters. Nevertheless, assuming that there would be such a balance, the argument is still rather weak. It is tantamount to saying that if three jurors are biased against the defendant, the jury is impartial so long as three other jurors are not.

The record demonstrates that the trial judge took special care to voir dire jurors individually and outside the presence of each other. He also made an earnest effort to reach and bring forth latent prejudice. Still, the special situation of this case prevents the effectiveness of voir dire. When asked whether he or she can be impartial, it is the rare individual who will say "no." Similarly, it is the rare partisan of Senator Eagleton who would concede that he or she would give greater weight to the Senator's testimony than to another's.

A change of venue is required when the minds of the inhabitants of the community in which the cause is pending may be so prejudiced that a fair trial cannot be had therein. *Cf.* Mo.Rev.Stat. § 545.030 (1949). Community prejudice may appear and influence an otherwise impartial jury when the defendant is somehow different than the rest of the community. *Cf. United States ex rel. Brown v. Smith*, 200 F.Supp. 885 (D.Vt.1961), *rev'd*, 306 F.2d 596 (2d Cir. 1962), *cert. denied*, 372 U.S. 959, 83 S.Ct. 1012, 10 L.Ed.2d 11 (1963) (Jewish man who recently settled in Vermont town made enemies as proprietor of cut rate drug store). However, community prejudice may also exist where the victim of the crime is well-respected by the community. *People v. McKay*, 37 Cal.2d 792, 236 P.2d 145 (Cal. 1951).

Senator Eagleton was recently reelected to his third term. There is little doubt that he was and is respected by the vast majority of the citizens of the State of Missouri. Because of his status and fame he possessed a relationship with each potential juror that is unlike that of any other person in Missouri. This community sentiment could easily be translated into community prejudice against the defendants accused of extorting him. In my judgment there existed a reasonable likelihood that community prejudice existed to such an extent that the defendants could not be guaranteed a fair trial. *Sheppard v. Maxwell*, 384 U.S. 333, 362–3, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1965). In *Sheppard* the Court held that the court has "the duty to make an independent evaluation of the circumstances" and where there is reasonable likelihood that prejudice might "prevent a fair trial, the judge should continue the case . . . or transfer it. . . ." *Id.* While publicity about the trial itself may not have been inflammatory, the supercharged atmosphere of the impending election, the publicity and notoriety of Senator Eagleton and the trial, the unique relationship of the Senator to the political beliefs of each of the potential jurors and the obvious focus upon the Senator's integrity and credibility in the issues tried mandated in my judgment a transfer of this trial outside the State of Missouri.

I conclude the trial court abused its discretion in denying defendants' motion for change of venue and the cause should be remanded for a new trial.